IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| ZENNA McCLAM, | ) | |
| | ) | |
| PLAINTIFF, | ) | C.A. No. 4:13-CV-3316-BHH-KDW |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| LAKE CITY FITNESS CENTER, f/k/a | ) | |
| iH3 WELLNESS CENTER and | ) | |
| HOPEHEALTH, INC. | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

Plaintiff Zenna McClam ("McClam" or "Plaintiff"), filed this action against her former[1]

employer, Lake City Fitness Center (the "Center"), which was operated by HopeHealth, Inc.

(collectively, "Defendants") alleging race discrimination and retaliation pursuant to Title VII of

the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* She also brings state-law

claims for intentional infliction of emotional distress, negligent retention and supervision, and

violation of the South Carolina Payment of Wages Act ("SCPWA"), although the only state-law

claim she pursues in responding to summary judgment is the one under SCPWA. Compl. ECF

No. 1.[2] This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule

73.02(B)(2) (D.S.C.) for a Report and Recommendation on Defendants' Motion for Summary

---

[1] The record is unclear regarding when Plaintiff left her employment with Defendants. However, Chief Operations Officer for HopeHealth, Inc., Deena Hilton, indicates HopeHealth ceased operating the Lake City Wellness Center on May 3, 2014. Hilton Aff. ¶ 3, ECF No. 39-2.

[2] Defendants seek summary judgment as to all of Plaintiff's claims; however, in responding to Defendants' Motion, Plaintiff does not defend (or even reference) her causes of action for negligent retention and supervision or intentional infliction of emotional distress. Accordingly, Plaintiff is considered to have abandoned those claims. *See Lee v. Jasper Cnty.*, No. 9:09-1878-SB-BM, 2012 WL 7149678, at *8 (D.S.C. Sept. 6, 2012) (noting undefended claims regarded as abandoned) (citing *Burns v. Air Liquide Am., L.P.*, 515 F. Supp. 2d 748, 759 n.9 (S.D. Tex. 2007)), *report and recommendation adopted*, No. CIV. A. 09-1878, 2013 WL 594890 (D.S.C. Feb. 14, 2013).

Judgment. ECF No. 39. Having considered the Motion; Plaintiff's Response, ECF Nos. 41, 42; Defendants' Reply, ECF No. 43; and applicable law, the undersigned recommends that Defendants' Motion for Summary Judgment be *granted* and this matter be ended in this court.

I.    Factual Background

HopeHealth is a community-based, not-for-profit primary and preventative healthcare provider that operates health centers in South Carolina. Hilton Aff. ¶ 2. From 2009 until May 2014, HopeHealth operated the Center, a fitness and wellness program located in Lake City, South Carolina. *Id.* ¶ 3.

In June 2009 Plaintiff was hired to work full time in a front desk/sales associate position at the Center. Approximately one week later, Plaintiff was promoted to customer service manager. *Id.* ¶ 4; Pl.'s Dep. 18-19, ECF No. 39-4. Plaintiff worked 40 hours per week and was paid initially a bi-weekly salary of $923.00 plus a commission of $10.00 per membership sale. Pl.'s Dep. 20. On March 15, 2010, Plaintiff's then-supervisor Meredith Harrington informed her that her pay was being reduced to $10.00/hour. *Id.* at 22-24, 69.[3]

Roosevelt Bryant (African American) became the Executive Director at the Center in 2011. Hilton Aff. ¶ 10, Pl.'s Dep. 69. Michele Holder, also African American, was the Wellness Coordinator, and effectively the second-in-command, at the Center. Hilton Aff. ¶ 10; Affidavit of HopeHealth's Human Resources ("HR") Director Celeste Johnson ¶ 11, ECF No. 39-3. Bryant, Holder, and Plaintiff, all African American, were the only full-time employees at the Center and, consequently, they were the only three employees at the Center who were afforded certain employment benefits (e.g., medical insurance, etc.). Hilton Aff. ¶ 11 &; Pl.'s Dep. 86. All of the

---

[3] In opposing summary judgment, Plaintiff indicates that "sometime between February 19, 2010, and May 28, 2010, Defendant changed [her] hours to 35 per week and changed [her] pay rate to an hourly rate of $10 per hour." Pl.'s Mem. 2 (attaching paystubs, ECF No. 42-1). Plaintiff does not contend that the March 2010 reduction was racially discriminatory. Pl.'s Dep. 53.

Center's other employees, both African American and Caucasian, were part-time employees who were not eligible for benefits. Hilton Aff. ¶ 11 & ex. A (Policy and Procedure Manual Excerpt); *see also* Pl.'s Dep. 108-09. Included among the part-time employees was Lee Ann Whetsell, a white female. Hilton Aff. ¶ 12. Whetsell was hired at the Center in March of 2011 as a fitness trainer and was paid $15 per class she taught. *Id.* At the beginning of 2012 Whetsell also began working as a sales associate for which she was paid an hourly wage ($9.50/hour). *Id.*; Whetsell Dep. 6-7, ECF No. 39-5. When Whetsell worked as a sales associate, she had some of the same duties as Plaintiff. Hilton Aff. ¶ 12, Whetsell Dep. 9-10, 12-14; Pl.'s Dep. 87-89. Plaintiff noted that all of the Center's employees were expected to work in membership sales and customer service to some extent. Pl.'s Dep. 52. Whetsell testified that she worked approximately 20 hours per week while employed at the Center. She never received a reduction in pay, and she did not recall ever being advised that her hours were being cut. Whetsell Dep. 22. Whetsell was never a full-time employee, and she was never given any employment benefits. Whetsell and Plaintiff were "co-employees." Hilton Aff. ¶ 12.

Plaintiff testified that, shortly after he took over as Executive Director in 2011, Bryant reduced her hours from 35 to 33 hours per week. Pl.'s Dep. 69. She testified that Bryant did not formally inform her of the reduction, but that each week her scheduled hours were posted behind the receptionist's desk and that she was aware from the posted schedules that she was slated to work only 33 hours each week. *Id.* at 71-74, 77-78.[4]

Plaintiff testified that she and Bryant worked well together initially, but that he began retaliating against her subsequent to an event that took place on April 24, 2012. Pl.'s Dep. 105. On April 24, 2012, Plaintiff discovered an error on a member's billing account in the computer

---

[4] Plaintiff does not seem to contend that the 2011 reduction in hours was racially motivated or discriminatory.

system and called it to Bryant's attention. *Id*. at 54-55, 78-79; *see* ECF No. 39-4 at 72 (a portion of a written grievance Plaintiff submitted in February 2013). After telling Bryant about the error, Plaintiff testified that he "got loud" with her, tried to embarrass her in front of other employees, and told her to go home. Pl.'s Dep. 54-55. After clocking out on his instruction, Plaintiff telephoned in a complaint about Bryant's sending her home without cause. *Id*. Plaintiff attempted to contact Celeste Johnson in HR, but Johnson was unavailable, so Plaintiff spoke with another female. Pl.'s Dep. 54. When asked whether she wished to file a complaint against Bryant, Plaintiff told the HR representative that she did. *Id*. at 55. The following day, Bryant called Plaintiff and asked if she wanted to return to work. She did return. *Id*. at 54-55.

Plaintiff testified that Bryant began to create a difficult work environment for her after the April 24, 2012 incident and complaint:

> A. And after that, that's when he began retaliating against me and that's when he hired, that's when he hired [Lee Ann Whetsell].[5] That's when the discrimination toward -- discrimination began and that's when all of this began when I had filed a complaint against him.
> Q. The complaint in April of 2012?
> A. That is correct. I don't know if they went forward with it. All I did was call.
> Q. Right. No, I'm, I'm, I'm not asking what they did with the complaint.
> A. Yes.
> Q. I'm saying your contention is that Roosevelt Bryant's retaliation against you began after you called Celeste [Johnson] and spoke with whomever, Celeste wasn't it, but spoke with whomever about Roosevelt's error in the system?
> A. That is correct.
> Q. And it's your contention that beginning in April of 2012 after that complaint is when Roosevelt began creating a hostile work environment for you?
> A. That is correct, sir.

---

[5]According to Hilton, Whetsell was hired by HopeHealth as a part-time fitness instructor on March 15, 2011, and was paid a rate of $15.00 per class. Hilton Aff. ¶ 12. At the beginning of 2012, Whetsell also became a customer service representative and was paid $9.50 per hour. *Id*. In responding to summary judgment, Plaintiff notes that Whetsell was "alleged to have been hired in March, 2011[,]" which was "just after the time between February 19, 2010 and May 28, 2010, when Defendants changed Plaintiff's hours to 35 per week and changed [her] pay rate to an hourly rate of $10 per hour." Pl.'s Mem. 3 (citing generally to Plaintiff's paystubs, ECF No. 42-1). The precise time Whetsell was hired is not material to the court's recommendation herein.

*Id.* at 55-56. Plaintiff further testified that Bryant admitted to her that his plan was to make work life difficult for her because of that complaint:

> Q. Okay. And you think this is all because you complained against Roosevelt in April of 2012?
>
> A. That is correct. Because he came to me in the office and told me, he said -- this is his exact words to be a Director. He came in the office and said, "I know what you done and said, believe me, I'm going to run you down."

*Id.* at 62; *see also id.* at 84-85, 105-07.

The Center operated at a net loss the entire time it was in existence. The losses stemmed in large part from declining membership numbers. Hilton Aff. ¶ 5. The Center had the capacity for 2400 members; shortly after it opened there were approximately 1900 members. By the close of 2012, the membership roll had decreased to approximately 1350. Pl.'s Dep. 20-21. For the period between April 2011 and February 2013, gross membership collections declined each month for 14 months of that 22-month period. Total collections were down in 17 months of the same 22-month period. Hilton Aff. ¶ 6. Gross membership collections in April 2011 were $40,573.00 (with total collections of $27,863.00), and by February 2013 gross membership collections had dropped to $18,677.29 (and total collections had dropped to $15,609.29). *Id.* ¶ 6. In April 2014, the last month during which HopeHealth operated the Center, gross membership collections were $11,982.00 and total collections had declined to $10,868.00. *Id.* The Center operated at deficit: from April 2011-March 2012, the Center's net income was -$58,918.38; from April 2012-March 2013, the net income was -$105,456.78; and from April 2013-March 2014, the net income was -$72,357.53. *Id.* ¶ 7.

The Center's consistent and significant financial decline was the subject of much concern and discussion among HopeHealth's executive officials. Hilton Aff. ¶ 8. Near the end of 2012, one of the cost-savings measures that HopeHealth administration began to consider was cuts to

employee work-hours and positions at the Center. *Id*. The administration considered which positions and duties at the Center could be handled effectively by someone working fewer hours. *Id*.

At its February 2013 meeting, the HopeHealth administration made the decision to decrease Plaintiff's hours from 33 to 25 hours per week. This changed Plaintiff's employment status from full-time to part-time. Johnson Aff. ¶ 6, Hilton Aff. ¶¶ 8-9. Pursuant to HopeHealth Policy 5.12, the move to part-time status meant Plaintiff was no longer eligible for certain benefits (except those to which she was entitled under COBRA, etc.). Hilton Aff. ¶ 9; Policy 5.12, ECF No. 39-2 at 7-8. Johnson (African American), notified Plaintiff of this change of status by letter dated February 18, 2013. Johnson Aff. ¶ 8; Feb. 18, 2013 Letter, ECF No. 39-3 at 6. The letter informed Plaintiff that the change was to take effect March 8, 2013, approximately three weeks later, and that it would result in a loss of benefits. Johnson Aff. ¶ 8, Feb. 18, 2013 Letter, ECF No. 39-3 at 6 (a copy of the letter is also found at ECF No. 39-4 at 70 and ECF No. 42-6 at 1). Plaintiff was also advised that if she did not accept the new terms of her employment, she would be terminated effective March 8, 2013. Plaintiff's rate of pay and commission remained unchanged. Pl.'s Dep. 111-12.

At the time of Plaintiff's change to part-time status, she had been one of three full-time employees at the Center. All three—Plaintiff, Bryant, and Hickson—are African American. Hilton Aff. ¶ 10, Johnson Aff. ¶ 11. HopeHealth administration determined the Center's operational needs required that Bryant and Hickson remain full-time employees. Hilton Aff. ¶ 10. All other employees at the Center were part-time and received no benefits. *Id.* ¶ 11; Pl.'s Dep. 108-09. While the status of the part-time employees was unchanged, reductions were made to the number of hours individuals worked in an effort to save as much as possible without impacting the Center's operational needs. Hilton Aff. ¶ 12. These work-hour reductions,

including Plaintiff's, resulted in significant reductions for staff-related costs from 2011-12 fiscal year to 2013-14 fiscal year (going from $244,389.19 to $161,051.19). Nonetheless, the Center continued to operate at a substantial loss and caused HopeHealth to cease operations of the Center entirely effective May 3, 2014. *Id.* ¶¶ 13-14.

In a February 28, 2013 memorandum to HopeHealth's Director of Corporate Compliance, Margaret Baker, Esq. ("Baker"), Plaintiff raised several grievances, ECF No. 39-4 at 71-75:

"<u>Fact A</u>":    In November 2012, Plaintiff received a DSS form completed by someone in HopeHealth's HR Department that indicated the system had scheduled Plaintiff to work 40 hours per week, although at the time she was scheduled to work 35 hours per week.[6] Plaintiff indicated this meant her hours had been changed without "upper management consent." Plaintiff's proposed remedy was for her to be repaid the difference between the hours she was actually scheduled to work (and actually worked) and the 40-hours-per-week schedule the system indicated she was to be working. Plaintiff sought to receive back pay to cover the difference for each week back to her initial reduction in hours in March 2010.

Plaintiff also claimed Bryant had changed her clock-out time in the timekeeping system on two dates: October 27, 2012 and December 5, 2012. *See* Pl.'s Dep. 64-66, 70-78.

"<u>Fact B</u>": Plaintiff relayed the events of April 24, 2012, when Bryant became upset with her and sent her home when she pointed out an error. Plaintiff noted she contacted HR after leaving that day and that the person with whom she spoke asked whether she wished to return to work. Plaintiff indicated she did want to return, and Bryant called her on the morning of April 25, 2012 and asked that she return. Plaintiff alleged Bryant had retaliated against her since that time, but offered no specifics. Plaintiff did not allege that Bryant's actions were the result of alleged racial discrimination. Feb. 28, 2013 Grievance, ECF No. 39-4 at 71-72; *see* Pl.'s Dep. 78-79.

"<u>Fact C</u>": Plaintiff indicated she was out of work from February 11 through February 13, 2013, with a "disability" of a swollen "right thumb joint and hand." ECF No. 39-4 at 73. Plaintiff stated she was under the care of her physician, Dr. Tracy DeBolt, and Dr. DeBolt had written Plaintiff an excuse for being out of work for those three days. Plaintiff also noted, "Due to my disability, Dr. DeBolt referred [Plaintiff] to a rheumatologist on May 21, 2013." *Id.* Plaintiff stated that, upon returning to work on February 13, 2013, she advised Bryant that someone had incorrectly entered patient/member information into the computer system. Bryant had entered the information himself, and when Plaintiff "informed" Bryant of the correct procedures, Bryant "became upset" with her. *Id.* Plaintiff stated that, as a result, Bryant instructed Johnson to write

---

[6] Although Plaintiff's Grievance referenced 35 hours, Plaintiff noted in deposition that her hours had been further reduced to 33 per week in 2011. Pl.'s Dep. 69.

the February 18, 2013 letter reducing Plaintiff's hours without advising or obtaining permission from "upper management" for this change in Plaintiff's hours. *Id.* Plaintiff indicated Bryant was "clearly guilty of violating" the FMLA.[7] *Id.* Plaintiff requests that Bryant be "dealt with according to Hope Health, Inc. employee policy and procedures and according to any Federal Employment Laws that may have been broken on [her] behalf." *Id.*; *see also* Pl.'s Dep. 80-82.

"Fact D": Plaintiff submits that the February 18, 2013 letter informing her that her hours were being reduced was not part of a cost-savings plan by HopeHealth, but was a plan by Bryant to have Plaintiff "illegally" terminated. Plaintiff contended Bryant was "trying to cover up his wrongdoing by changing [Plaintiff's] working hours without upper management consent (wages), retaliation, disability, and demotion." ECF No. 39-4 at 74. Plaintiff stated she felt Bryant was "trying to get rid of [her] because he was under investigation and getting rid of [her] was his answer to keeping his position." *Id.* As a remedy, Plaintiff proposed she be restored to full-time status with benefits and compensated for her lost pay. *Id.*

"Fact E": Plaintiff stated that, when she saw Johnson in January 2012 to discuss "getting [her] hours back (40 hours week)," Johnson advised Plaintiff to check her emails for the answer to her question. ECF No. 39-4 at 75. Plaintiff indicated when she searched for emails Bryant had sent her concerning her hours, those emails had been deleted. She stated a vendor she contacted advised her that the compromise to her email account took place on December 1, 2012. Plaintiff indicated no one other than Bryant had known her email password at that time and contended that the compromise of her e-mails violated her "HIPPA" (presumably, HIPAA) rights. *Id.*; *see also* Pl.'s Dep. 93-101. As explained in deposition, this concerned Bryant's "changing the hours in the system without [Johnson's] authorization." Pl.'s Dep. 95-96.

Baker investigated Plaintiff's claims and determined that Bryant had violated policy by changing Plaintiff's clock-out time in the timekeeping system totaling seven hours on October 27, 2012 and December 5, 2012. Baker Dep., ECF No. 39-6 & ECF No. 39-6 at 4-5 (Baker's May 20, 2013 Mem. to Plaintiff regarding results of investigation). Baker acknowledged the other portions of Plaintiff's grievance as well but found no additional action necessary. *Id.*

On April 16, 2013, Plaintiff submitted a charge of race discrimination to the South Carolina Human Affairs Commission ("SHAC") and the Equal Employment Opportunity Commission ("EEOC") in which she complained that the reduction of her hours "on or about March 15, 2013" was racially discriminatory. ECF No. 39-4 at 68 (the Charge was signed by a SHAC/EEOC representative on April 17, 2013). Plaintiff stated her hours "allegedly" had been

---

[7] Plaintiff's Complaint does not include a claim under the Family Medical Leave Act ("FMLA").

reduced because of financial restraints, but that she knew that to be false because she was "aware of a similarly situated white female that was hired and given benefits." *Id.* Plaintiff amended the charge on May 29, 2013 to "add intimidation and demotion as issues" to the charge filed in April 2013. ECF No. 39-4 at 69. She also noted the change in hours and removal of benefits began on March 8, 2013. *Id.* Plaintiff asserted that Bryant and Johnson had "conspired" to target her for "loss of full-time employment status leading to termination." *Id.* According to Defendants, the EEOC issued a right to sue letter on September 11, 2013.[8]

Plaintiff then filed suit on November 27, 2013, alleging racial discrimination and retaliation under Title VII, 42 U.S.C. § 2000e. Compl. ¶¶ 22-23. Plaintiff also asserts a claim under the SCPWA, alleging that her pay and/or hours were reduced without the required seven-day's written notice. *Id.* ¶¶ 32-35. Plaintiff's Complaint also included state-law claims for outrage and negligent retention/supervision of Bryant, *id.* ¶¶ 24-31, although she has abandoned those state-law claims by failing to defend them in her response to summary judgment.

II.    Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

---

[8] *See* Defs.' Mem. 9. Defendants do not dispute that Plaintiff exhausted administrative remedies.

materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact).  In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing  Prods., Inc*., 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. *See id.* at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth

sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

III.    Analysis

Plaintiff's Complaint includes claims of race discrimination and retaliation in violation of Title VII and violation of the SCWPA. ECF No. 1. Defendants move for summary judgment as to each cause of action.

A.    Burden of Proof in Title VII Discrimination Claims

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e–2(a)(1). A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof. First, she may establish through direct or circumstantial proof that a protected characteristic such as race was a motivating factor in the employer's adverse decision. *See Diamond v. Colonial Life & Acc. Ins. Co.,* 416 F.3d 310, 318 (4th Cir. 2005); *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc). Direct evidence is defined as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 520 (4th Cir. 2006) (internal quotations omitted). Direct evidence is said to prove a fact "without any inference or presumptions." *O'Connor v. Consol. Coin Caterers Corp.,* 56 F.3d 542, 548 (4th Cir. 1995). Circumstantial evidence must be of sufficient probative force to raise a genuine dispute of material fact. *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 959 (4th Cir. 1996). "In such cases, historically referred to as 'mixed-motive' cases, it is sufficient for the individual to demonstrate that the employer was motivated to take the adverse employment

action by both permissible and forbidden reasons." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004).

Absent such direct or circumstantial evidence, a plaintiff may proceed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Plaintiff here proceeds under the burden-shifting framework only. *See* Pl.'s Mem. 6-9, so the court considers her claims under the burden-shifting framework. Pursuant to this framework, once the plaintiff establishes a prima facie case of a violation of Title VII, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

While intermediate evidentiary burdens shift back and forth, the ultimate burden of persuasion that the defendant engaged in intentional discrimination remains at all times with the plaintiff. *See Reeves,* 530 U.S. at 146-47 ("The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'") (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993)).

In sum, the Fourth Circuit has emphasized that, "[r]egardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate

treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill,* 354 F.3d at 286 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 153 (2000)).

B.     Title VII Claims

1.     Race Discrimination

a)     Prima Facie Case

Defendants seek summary judgment as to Plaintiff's Title VII race discrimination claim. Lacking direct evidence, Plaintiff can establish a prima facie case of disparate treatment by showing the following: (1) she is a member of a protected class; (2) she was qualified for the job and her performance satisfied her employer's expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside her protected class received more favorable treatment. *See Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). "Liability in a disparate-treatment case depends on whether the protected trait actually motivated the employer's decision." *Young v. United Parcel Serv.,* 135 S. Ct. 1338, 1345 (2015) (quoting *Raytheon Co. v. Hernandez,* 540 U.S. 44, 52 (2003)).

Defendants concede Plaintiff is the member of a protected class. Further, they admit the reduction of Plaintiff's hours to part-time and the resulting removal of benefits constitutes an adverse employment action for these purposes. For purposes of this Motion, they also concede Plaintiff was performing satisfactorily. *See* Defs.' Mem. 10 n.5. The only prong of the prima facie discrimination case Defendants challenge is the fourth one—that similarly situated employees outside her protected class received more favorable treatment.

Plaintiff's race-discrimination claim focuses on the reduction in her hours and her change from full-time to part-time status that was announced on February 18, 2013, and became effective as of March 8, 2013. She points to Whetsell as her comparator—a Caucasian female

who allegedly was similarly situated but received more favorable treatment than Plaintiff. *See* Pl.'s Mem. 3.[9]

To show similarly situated colleagues were comparators, plaintiffs must show that "they are similar in all relevant respects to their comparator." *Haywood v. Locke,* 387 F. App'x 355, 359 (4th Cir. 2010). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992)); *see also Ward v. City of N. Myrtle Beach,* 457 F. Supp. 2d 625, 643 (D.S.C. 2006).

The undersigned agrees with Defendants that Whetsell and Plaintiff were not sufficiently similar to satisfy this prong of her prima facie case. Simply put, Plaintiff was a full-time employee whose hours were cut, causing her to become a part-time employee who was ineligible for benefits. It is undisputed that Whetsell was always a part-time employee and had never been eligible for benefits. The adverse employment action being considered is Plaintiff's "demotion" from full-time to part-time employee when her hours were cut.

Plaintiff proffers testimony of Whetsell to show they performed similar duties. Pl.'s Mem. 7; Whetsell Dep. 13 (noting Plaintiff "handled the billing and she handled the front desk. Basically, she works one part of the job, I [Whetsell] worked in another area, but we were

---

[9] Plaintiff notes the prima facie discrimination case includes the factor of a comparator. Pl.'s Mem. 6. She also notes that a plaintiff is not always "'required as a matter of law to point to a similarly situated . . . comparator in order to succeed' on a discrimination claim." *Id.* (quoting *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003)). However, in cases such as the one at bar, in which Plaintiff has based her discrimination claim on her being treated differently from one particular employee (Whetsell), "the validity of [her] prima facie case depends upon whether that comparator is indeed similarly situated." *Haywood*, 387 F. App'x at 359 (citing *Burdine,* 450 U.S. at 258 [and] *McDonnell Douglas,* 411 U.S. at 804) ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.")). Plaintiff has not proffered other specific evidence of discriminatory disparate treatment. The court appropriately considers the comparator factor in this case.

essentially the same [].”). That Plaintiff and Whetsell performed some of the same job duties, though, does not make her an appropriate comparator. Whetsell testified that she worked approximately 20 hours per week while employed at the Center. Whetsell was never a full-time employee and was never given any employment benefits. Accordingly, she could not be said to be “subject to the same standards” or treated “more favorably” than Plaintiff. *Cf. Kelley v. United Parcel Serv., Inc.*, No. 4:10-CV-1420-RBH, 2012 WL 3765180, at *4 (D.S.C. Aug. 30, 2012) *aff'd,* 528 F. App’x 285 (4th Cir. 2013) (citing *Mitchell,* 964 F.2d at 583; *Ilhardt v. Sara Lee Corp.,* 118 F.3d 1151, 1155 (7th Cir. 1997) (finding full-time employee was not similarly situated to a part-time employee); *Pyatt v. Harvest Hope Food Bank,* No. 3:10–2002–MBS–PJG, 2012 WL 1098632, at *7 (D.S.C. Feb. 1, 2012), *adopted by* 2012 WL 1098627 (D.S.C. Mar. 29, 2012) (finding that individuals were not similarly situated and that Title VII claim failed as a matter of law, due, in part, to one being a part-time employee while the other was a full-time employee); *Black v. Potter,* No. 4:06–899, 2008 WL 509475, at *11 (D.S.C. Feb. 21, 2008) (holding that fellow employee was not similarly situated when he held a position higher than that of plaintiff)); (noting “differentiating circumstances” between part-time and full-time employees “distinguished employer’s treatment of them” and made full-time employee an invalid comparator for purposes of part-time employee’s prima facie Title VII discrimination claim). Plaintiff and Whetsell are not valid comparators. Plaintiff points to no other potential comparator and cannot establish her prima facie case.[10]

---

[10] Plaintiff’s brief argument that a question of fact exists as to whether Plaintiff and Whetsell were similarly situated is unavailing. *See* Pl.’s Mem. 7 (citing *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009)). Nothing in that non-controlling case suggests factual issues exist here that would further Plaintiff’s prima facie case. Indeed, in *Patterson*, the court found as a matter of law that plaintiff and her would-be comparators were not similarly situated in part because they did not hold the same job.

b)    Pretext Analysis

Even assuming, *arguendo*, that Plaintiff could establish her prima facie case of Title VII race discrimination, summary judgment remains appropriate.  Defendants have met their burden of setting out legitimate business reasons to reduce Plaintiff's hours and convert her to a part-time employee. As explained in detail by Hilton (and set out more fully above), the Center's collections and income were steadily decreasing, making cost-saving measures necessary. *See generally* Hilton Aff. Hilton noted HopeHealth's administration regularly discussed the financial losses and potential cost-saving measures. *Id.* ¶ 8. Plaintiff's change in status from full- to part-time resulted in cost savings. *Id.* ¶ 9.

Plaintiff has not set forth sufficient evidence to demonstrate Defendants' explanation for her treatment was merely pretextual.  *See Atkins v. Holder*, 529 F. App'x 318, 320 (4th Cir. 2013) (noting if a plaintiff puts forth a prima facie case, defendant must offer a nondiscriminatory explanation for the action(s) and then the burden of proof returns to plaintiff to show the employer's proffered explanation is pretextual) (Title VII); *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2005) (same in retaliatory discharge context). Courts are not to second-guess an employer's decision on human resources matters, so long as such decisions are not based on an unlawful reason. "Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity. . . ." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006).  "[I]t is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). Plaintiff cannot show that Defendants' stated reasons for her treatment were pretext and that she was treated differently because of her race.

In attempting to establish pretext, Plaintiff argues that, in 2012, Whetsell, who had been a part-time fitness instructor since 2011, was "promoted" to also work as a part-time sales associate. Plaintiff submits this change took place "just before" Plaintiff's reduction in hours and "demotion" and that, at the time Whetsell took on these additional duties, Defendants would have already been suffering "financial hardship and membership decline[.]" Pl.'s Mem. 3; *see also id.* at 8-9. Plaintiff also argues that a "reasonable fact finder would question" why an employer facing economic decline would "promote" one employee (Whetsell) and "demote" another (Plaintiff) at the same time. *Id.* at 9. Similarly, in her deposition, Plaintiff suggested that if her hours had to be cut because of financial hardship, then everyone's hours should have been cut. Pl.'s Dep. 108-09.

Plaintiff has not satisfied her burden of showing her race was the reason her hours were decreased and benefits ended. As noted above, the court is not to determine whether the proffered reason "was wise, fair, or even correct, ultimately, so long as it truly was the reason for [action against the employee]." *DeJarnette*, 133 F.3d at 299. In order to prove pretext a plaintiff can show a defendant's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [] discrimination." *See Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (internal quotation marks omitted). That Whetsell's fitness-instructor role was expanded at the beginning of 2012 to attempt to include sales of additional memberships at a time when membership revenues were down is imminently reasonable and is not indicative of racial discrimination. In addition, Hilton testified that part-time employees were by no means scheduled to work "the maximum number of hours each week." Hilton Aff. ¶ 11. Plaintiff has not demonstrated that she was the only one whose hours were diminished. Further, for a plaintiff to prove an employer's articulated reason is a pretext for discrimination, he "must prove *both* that the reason was false, *and* that discrimination was the real reason for the

challenged conduct." *Jimenez* v. *Mary Wash. Coll.,* 57 F. 3d 369, 378 (4th Cir. 1995) (emphasis in original) (internal quotation marks and citations omitted). Plaintiff has not established pretext. Defendants' Motion should be granted as to Plaintiff's Title VII claim of race discrimination.

2.     Title VII Retaliation Claim

Plaintiff also raises a claim of retaliation pursuant to Title VII. A plaintiff may demonstrate a violation of Title VII through direct or circumstantial evidence. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). When, as here, direct evidence is lacking, a plaintiff may proceed under the *McDonnell Douglas* burden-shifting framework. *See Foster v. Univ. of Md.-E. Shore,* 787 F.3d 243, 249 (4th Cir. 2015) (confirming the *McDonnell Douglas* framework remains appropriate when Title VII retaliation plaintiff is not proceeding under direct-evidence, so-called "mixed motive" theory). First, a plaintiff bears the burden of establishing a prima facie case of retaliation by showing the following: "(1) []he engaged in a protected activity; (2) the employer took an adverse employment action against [him]; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2011) (internal quotation omitted). If the plaintiff presents a prima facie case, the burden then shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse action. If the employer sets forth a legitimate, non-retaliatory reason for the action, the plaintiff then bears the burden of showing the employer's proffered reasons are pretextual or his claim will fail. *See Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004).

Recently, the United States Supreme Court clarified that, in the Title VII retaliation context, a plaintiff must prove retaliation was the but-for cause of the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). In other words, the successful plaintiff in a Title VII retaliation suit must show that the complained-of injury would not have occurred "but for" the alleged retaliatory motive. *Id.; see also id.* at 2524-25. In so holding, the Court rejected the argument that a Title VII retaliation claimant had to establish the lessened "motivating-factor" causation standard applicable to some status-based Title VII causes of action. *See* 133 S. Ct. at 2533-34.   The *Nassar* case was before the Court subsequent to a jury verdict that had not involved proof by way of the *McDonnell Douglas* framework, so the Court did not discuss whether the prima facie case remained viable in such claims and, if it did, whether the but-for causation requirement would be considered as part of a plaintiff's prima facie case or part of the pretext analysis. Noting some confusion on the issue post-*Nassar*, the Fourth Circuit determined in *Foster* that the *McDonnell Douglas* framework remains viable and that the but-for causation requirement is part of plaintiff's proof at the pretext stage. 787 F.3d at 248-52.

Plaintiff alleges that, subsequent to her April 24, 2012 oral complaint about Bryant's sending her home without cause, Bryant retaliated against her by undertaking to create a hostile work environment for her. *See* Pl.'s Dep. 54-56, 62, 78-80, 83-85, 105-07; Written Grievance, ECF No. 39-4 at 71-75. Plaintiff testified that Bryant told her, "I know what you done and [he] said, believe me, I'm going to run you down." Pl.'s Dep. 62.

In their Motion, Defendants do not challenge that Plaintiff can show an adverse employment action. However, they argue that Plaintiff cannot satisfy the first prong of her prima facie case—that she engaged in protected activity. Def.s' Mem. 14-15.

19

"Protected activity" falls into one of two categories: opposition or participation. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.,* 555 U.S. 271, 274 (2009); *Peters v. Jenney,* 327 F.3d 307, 320 (4th Cir. 2003) (noting that to establish that a plaintiff engaged in protected opposition activity, she must show that she opposed an unlawful employment practice that she reasonably believed had occurred or was occurring). To have engaged in protected opposition activity, a plaintiff must have conveyed to the employer a reasonable belief that the actions complained of violated federal law. *Jordan v. Alternative Res. Corp.,* 458 F.3d 332, 340–41(4th Cir. 2006) (stating that "an employee seeking protection from retaliation must have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress") (citing *EEOC v. Navy Fed. Credit Union,* 424 F.3d 397 (4th Cir. 2005)). The plaintiff must: (1) have a good faith belief that the employer is engaging in an unlawful employment practice; and (2) show that the belief is objectively reasonable. *Peters,* 327 F.3d at 321. In other words, the opposition clause "protects opposition neither to all unlawful employment practices nor to practices the employee simply thinks are somehow unfair." *McNair v. Computer Data Sys., Inc.,* 172 F.3d 863, 1999 WL 30959, at *5 (4th Cir. Jan. 26, 1999) (unpublished).

The undersigned agrees with Defendants that Plaintiff has not presented evidence that she engaged in a "protected activity" because her complaints were about having been treated unfairly by her supervisor who was the same race as she. Throughout her deposition, Plaintiff states she believed Bryant was mad at her because she complained about him to HR in April 2012. *E.g.,* Pl.'s Dep. 84-85. She never attributed the actions of Bryant (or anyone else, for that matter) to race. *See id.* Even in the February 28, 2013 written grievance,[11] Plaintiff does not make explicit

---

[11] Plaintiff's written grievance of February 28, 2013 post-dates Plaintiff's being told she was being moved to part-time status (letter dated February 18, 2013, to take effect March 8, 2013).

or implicit claims that her race had anything to do with her treatment. *See* ECF No. 39-4 at 71-75. In discussing the April 24, 2012 incident, Plaintiff indicated Bryant "used his position" to send her home and to "retaliate" against her in violation of "Federal Laws for retaliation against an employee under a supervisor who used the work place [] to undermine the employee." *Id.* at 72. "'The list of impermissible considerations within the context of [Title VII] employment practice is both limited and specific: "race, color, religion, sex or national origin." We are not free to add our own considerations to the list.'" *Balazs v. Liebenthal,* 32 F.3d 151, 159 (4th Cir. 1994) (*quoting Holder v. City of Raleigh,* 867 F.2d 823, 826 (4th Cir. 1989)). Treatment that is allegedly unfair is not actionable under Title VII and, as such, complaint about such treatment is not protected activity for purposes of a retaliation claim. *Hemphill v. United Parcel Serv., Inc.,* 975 F. Supp. 2d 548, 562-63 (D.S.C. 2013) (finding plaintiff's email with allegations that she was "being treated unfairly," had been "spoken to in a very unprofessional, disrespectful, and degrading manner," had been "verbally threatened about [her] job and [her] life," and had been "openly embarrassed and humiliated" did not constitute protected activity in support of a Title VII retaliation claim); *see Fisher v. City of N. Myrtle Beach*, No. 4:11-CV-01726-RBH, 2013 WL 4018603, at *11 (D.S.C. Aug. 6, 2013) ("Unfair treatment, irrespective of [protected characteristic], does not rise to the level of an unlawful employment action."). That Bryant allegedly "used his position" to intimidate Plaintiff is not violative of Title VII. She has not established the protected-activity prong of her prima facie retaliation claim.

Nothing in Plaintiff's Memorandum convinces the court otherwise. Plaintiff's general argument in support of her retaliation claim seems to be simply that it is undisputed that she

---

Plaintiff does not seem to reference any allegedly retaliatory acts that took place subsequent to February 28, 2013. In any event, Plaintiff has not presented a viable retaliation claim.

complained to Defendants about Bryant. *See* Pl.'s Dep. 7-8. She offers no factual or legal argument that her complaints concerned race-based discrimination.

In any event, even if any of Plaintiff's complaints about Bryant could be considered protected activity, Plaintiff cannot establish the final prong of the Title VII retaliation prima facie case: that a causal connection existed between Plaintiff's complaints and adverse employment action(s). The undersigned agrees with Defendants that Plaintiff cannot show a causal connection because the adverse action took place in February 2013, many months after Plaintiff's April 2012 complaint about Bryant's treatment of her. *See* Defs.' Mem. 16. A causal connection may exist when "the employer takes employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). The "passage of time tends to negate the inference of discrimination." *Id.* Plaintiff offers no argument or evidence to otherwise demonstrate the requisite causation. Because she cannot establish a prima facie case of retaliation under Title VII, summary judgment is appropriate.[12]

C.    State-Law Claims

Defendants also seek summary judgment as to all of Plaintiff's state-law claims. While Plaintiff's Complaint includes causes of action for intentional infliction of emotional distress ("IIED"), negligent retention and supervision, and violation of the SCWPA, the only state-law claim Plaintiff defends in responding to summary judgment is the statutory claim.

---

[12] As noted in *Foster*, the causation prong of the prima facie is "less onerous" than the proof required at the pretext stage. 787 F.3d at 251. In the event it were determined Plaintiff has met that less onerous standard and established a prima facie case, the evidence is insufficient for Plaintiff to establish the but-for causation required in establishing pretext. *See id.* at 252 (noting a plaintiff is required to show retaliation was the "'real reason'" for the action, or, in other words, "to show that the harm would not have occurred in the absence of—that is, but-for—the defendant's conduct.'") (quoting *Holland v. Wash. Homes*, 487 F.3d 208, 218 (4th Cir. 2007) and *Nassar*, 133 S. Ct. at 2525). Granting summary judgment as to Plaintiff's claim of retaliation remains appropriate if considering pretext.

It is recommended that summary judgment be granted as to Plaintiff's causes of action for negligent retention and supervision or intentional infliction of emotional distress because she has abandoned those claims. *See Lee*, 2012 WL 7149678, at *8.

If the court accepts this Report and Recommendation, the federal (and some state) causes of action will be ended, leaving only Plaintiff's cause of action for violation of the SCPWA. Compl. ¶¶ 32-35. Both Plaintiff and Defendants appear to be from South Carolina, so diversity jurisdiction does not exist. Because it appears that the federal claims should be dismissed before trial, the factors of judicial economy, convenience, fairness, and comity suggest that this court ought to decline jurisdiction over the remaining appended state statutory claim against Defendants. *See* 28 U.S.C. § 1367(c)(3). It is recommended that Plaintiff's cause of action for violation of South Carolina's Payment of Wages Act be dismissed without prejudice and with leave for Plaintiff to refile in state court within 30 days as provided by 28 U.S.C. § 1367(d), unless state law provides a longer period of time.

IV.    Conclusion and Recommendation

For the reasons set forth herein, it is recommended that Defendants' Motion for Summary Judgment be granted and this matter be ended in this court.

IT IS SO RECOMMENDED.

July 8, 2015                                         Kaymani D. West
Florence, South Carolina                            United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**